416 F.Supp. 1267 (1976)
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), et al., Plaintiffs,
v.
CARDWELL MANUFACTURING COMPANY, INC., and International Banknote Company, Inc., formerly BTB Corporation, Defendants.
Civ. A. No. W-4796.
United States District Court, D. Kansas.
May 11, 1976.
*1268 *1269 Lee H. Woodard, of Arst & Woodard, Wichita, Kan., Youngdahl & Larrison, Little Rock, Ark., for plaintiff.
Ronald M. Gott, of Gott, Hope, Gott & Young, Wichita, Kan., for B.T.B. & Cardwell Mfg. Co.

DECISION OF THE COURT
THEIS, District Judge.
This is an action seeking an accounting for and recovery of funds that the plaintiffs claim were to be paid into a pension plan which was created, and to be maintained, pursuant to collective bargaining contracts and supplements thereto entered into by the defendant Cardwell Manufacturing Company, Inc. (hereinafter referred to as "Cardwell"), and the plaintiffs, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) Local 972 (hereinafter respectively referred to as the "International" and "Local").
Under the various causes of action of the Second Amended Complaint, either one of both of said plaintiffs seek to recover judgment for said pension plan funds from either or both the defendant Cardwell, and/or its parent corporation, the defendant, BTB Corporation (hereinafter referred to as "BTB"), or its successor in interest, International Banknote Company, Inc.
Plaintiffs' theories of recovery, as established by the evidence, encompass three principal causes of action. Plaintiffs assert their principal and first cause of action under 29 U.S.C. § 185 for the violation of collective bargaining contracts, seeking judgment against the defendants Cardwell and BTB on the theory that both are liable by their actions as employers within the meaning of 29 U.S.C. § 185 for the pension plan obligations of the defendant Cardwell by reason of the unity, continuity and identity of interest between said defendants.
Under the so-called second primary cause of action so plead, and as an extension of *1270 and implementation of their principal cause of action under the National Labor Relations Act plaintiffs seek recovery against the defendant BTB under the general common law doctrine of piercing the corporate veil of the defendant BTB by showing Cardwell's actions to have been BTB's actions. Plaintiffs' first cause of action and its second cause, as plead, must be considered together as one single cause under our national labor statutes.
Plaintiffs' other theories of recovery as alleged in the third and fourth causes of action are alternative to their success or failure in the first and second causes of action. Under the third cause of action the plaintiff Local claims that defendant Cardwell was induced to default in its pension plan payments and thereby breached its pension plan agreement and collective bargaining contracts with the plaintiffs by reason of intentional and willful acts on the part of the defendant BTB, and that such acts constitute actionable interference with the contracts.
In the fourth cause of action, it is asserted that defendants Cardwell and BTB had an understanding or agreement constituting a conspiracy whereunder the defendant Cardwell was to, and did, breach its pension plan agreement and collective bargaining contracts with the plaintiffs by failing to pay the amounts owing into the pension plan, and that defendant BTB is therefore liable as a co-conspirator for damages resulting from the said breach.
The parties stipulate and the Court finds that venue is properly laid in the District of Kansas; that all the proper, necessary and indispensable parties are parties to this action; that the Court has jurisdiction of the subject matter of all the several causes of action as alleged in the Second Amended Complaint; and that the Court has jurisdiction to grant the declaratory relief sought by plaintiffs under the various causes of action by reason of and under 28 U.S.C. §§ 2201 and 2202. This case was tried to the Court in a protracted trial and necessarily the evidence encompassed both a large number of witnesses and documentary exhibits. As a result of this trial and subsequent submission by counsel for the parties of suggested Findings of Fact and Conclusions of Law, and briefs in support thereof, the Court makes the following Findings of Fact and Conclusions of Law, and thereafter the "Opinion of the Court," as commentary on this case.

FINDINGS OF FACT

PARTIES
1. At all times material to this action the defendant, Cardwell Manufacturing Company, Inc., was an employer in industry affecting commerce within the meaning of the National Labor Relations Act, as amended, 29 U.S.C. §§ 141 to 187. Cardwell is, and was at all times material hereto, a corporation created and doing business under the laws of Kansas with a principal place of business located at Wichita, Sedgwick County, Kansas.
2. The defendant, International Banknote Company, Inc., is and was at all times material hereto, a corporation created and existing under the laws of New York with a principal place of business located at 230 Park Avenue, New York, New York. At the time said defendant acquired Cardwell, as hereinafter described, its corporate name was B. T. Babbit, Inc. Prior to the filing of this action the corporate name was changed to BTB Corporation, and on or about December 29, 1972, the corporation again changed its name to the present one.
3. At all times material hereto, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) Local # 972, were labor organizations representing employees in Kansas and in an industry affecting commerce within the meaning of the National Labor Relations Act, as amended, 29 U.S.C. §§ 141 to 187. In addition, and at all times material hereto, the Union was the sole collective bargaining agent for the Cardwell collective bargaining unit, and was so certified by the National Labor Relations Board. *1271 The bargaining unit consisted of Cardwell employees known and identified as production and maintenance employees excluding foremen, supervisory employees, administrative, professional, confidential and office employees as defined by the Labor Management Relations Act of 1947, as amended. The Local is, and was at all times material hereto, an unincorporated association and its members are residents of the State of Kansas.
4. The individual plaintiffs, L. W. Wormser, Loren Haines, A. L. Widener and John Fulzenloger are, and were at all times material hereto, residents of the State of Kansas and representative members of the Local, and have fairly and adequately protected the interests of the Local and its members and will continue to do so.

CORPORATE STRUCTURE, OWNERSHIP AND GENERAL CORPORATE BACKGROUND
5. At all material times prior to July 28, 1967, all of Cardwell's issued and outstanding stock was owned by U. S. Oil of Louisiana, Inc., a Delaware Corporation, which was controlled by John W. Mecom. On July 28, 1967, John W. Mecom, through U. S. Oil of Louisiana, Inc., sold all of Cardwell's issued and outstanding stock to Layneshore Corporation, a New York Corporation. Layneshore was formed by Edward H. Weitzen and his sister, Annabelle Model, for the sole purpose of, and only as a vehicle for, acquiring and owning the Cardwell stock. Thus, as a practical matter, Weitzen and Mrs. Model became the sole stockholders and owners of Cardwell when the purchase of the Cardwell stock from U. S. Oil of Louisiana, Inc. was consummated on July 28, 1967. As a part of this transaction Weitzen made arrangements for Walter C. Heller and Company to provide Cardwell with financing. Under the original agreement Heller loaned Cardwell $8,000,000.00, which was secured by Cardwell's fixed assets and a personal guarantee by Weitzen in the amount of $200,000.00. This loan was used to pay preexisting Cardwell debt of $7,645,479.42 owed to the Chase Manhattan Bank with the balance of $354,520.58 being retained by Cardwell for operating capital. At the time this loan was negotiated, Heller further agreed to factor Cardwell's receivables which basically gave Cardwell a revolving line of credit against, and secured by, its receivables. This revolving line of credit had maximum limit and the exact amount which Heller would loan against receivables depended upon a predetermined formula set forth in the agreement between Heller and Cardwell. By December 31, 1971, the total debt owed Heller, including two additional loans negotiated by BTB, was reduced to $1,300,000.00, and by March of 1973, substantially all, if not all, indebtedness owed to Heller had been repaid.
6. When Weitzen and Mrs. Model acquired Cardwell they became members of the Cardwell Board of Directors which consisted of five members at that time. The other three Directors were Mrs. Model's husband, Joseph Model, and John W. Mecom and his son. The Mecoms were inactive board members and never participated in the affairs of Cardwell. They eventually resigned from the Cardwell Board and no additional members were elected thereto.
7. Upon Weitzen and Mrs. Model acquiring Cardwell, Weitzen became the Cardwell President and Mrs. Model became a Vice-President. Fred L. Bockenheuser, who had been a Cardwell officer, became a Vice-President and Treasurer of Cardwell shortly after Weitzen and Mrs. Model acquired the corporation.
8. After Weitzen and Mrs. Model acquired Cardwell Weitzen maintained a Cardwell office in New York City located at 230 Park Avenue. Just prior to the acquisition he had been Chairman of the Board and Chief Executive of General Battery and Ceramics Corporation, which had also maintained an office at the same location. Weitzen was, however, active as Cardwell's corporate President and commuted regularly from New York to the Cardwell plant in Wichita, Kansas, for the purpose of managing the affairs of Cardwell. During the period that Weitzen and Mrs. Model owned Cardwell, Weitzen decided, and was responsible *1272 for, Cardwell diversifying into the areas of marine handling equipment contracts and government contracts. Prior to such time, and at all times since World War II, the business of Cardwell had primarily been the manufacture of oil field equipment and replacement parts therefor. This diversification commenced in January of 1968, and in connection therewith Mrs. Model devoted her efforts to acquiring government contract work.
9. On May 23 or 24, 1968, Weitzen and Mrs. Model, through Layneshore, sold all of Cardwell's issued and outstanding stock to BTB. The sale of the Cardwell stock was negotiated by Weitzen and BTB in February of 1968, and although the transaction was not consummated until May of 1968, the BTB Board of Directors formally approved the acquisition of Cardwell on April 23, 1968.

BTB AND CARDWELL INTERLOCKING OR COMMON OFFICERS AND DIRECTORS
10. As a part of the transaction whereby BTB acquired Cardwell, it was agreed that Weitzen would be employed as BTB's Chief Executive Officer. Thus, immediately after BTB acquired the Cardwell stock, Weitzen was elected President of BTB and also elected to BTB's Board of Directors. At the same time, BTB and Weitzen entered an employment agreement whereunder BTB employed Weitzen as its Chief Executive for a term expiring approximately five years after notice of election of either Weitzen or BTB to terminate the agreement. From 1970 on Weitzen was also represented as being BTB's Chief Financial Officer in form 10K reports filed with the Securities and Exchange Commission.
11. On May 25, 1968, one day after BTB acquired Cardwell, Mrs. Model was employed by BTB as an assistant to the President (Weitzen). Since 1969, she has been a Vice-President of BTB and a member of the BTB Board of Directors. On September 22, 1971, she was also elected Secretary of BTB.
12. From the time BTB acquired Cardwell to the present, Weitzen has been the Chief Executive Officer and President of both BTB and Cardwell and a member of both the BTB and Cardwell Board of Directors; during the same period Weitzen's sister, Mrs. Model, has been either an officer, director or employee of BTB, and during all of such time she has been a Cardwell officer and a member of its Board of Directors; and further, Joseph Model, the husband of Mrs. Model and brother-in-law of Weitzen, has been a member of the Cardwell Board of Directors during all of such time. As aforesaid, and at all times material hereto, the Cardwell Board, for all practical purposes, was a three-member Board consisting of the above-named individuals. In addition, since at least sometime in 1970, Weitzen and Model have constituted two of the three members of the BTB Executive Committee and they have also been the only BTB executive officers on that Committee since such time.
13. On May 27, 1968, which was the date Weitzen was elected to the BTB Board of Directors and to the office of President, and became its Chief Executive Officer, Eugene Jonas was employed by BTB as an Assistant to the President. On May 27, 1968, he became Assistant Secretary and Assistant Treasurer of BTB, and on September 22, 1971, he became the BTB Treasurer and a member of its Board of Directors. At some time after he was first employed by BTB, Jonas became Assistant Secretary of Cardwell. He held that office, however, without salary from Cardwell for the mere purpose of handling formalities and any substantial action taken by Jonas with respect to Cardwell's operations or affairs was in his capacity as a BTB employee, officer and/or director.
14. After BTB acquired Cardwell, Weitzen maintained a BTB office at 230 Park Avenue, New York City, which was the same location where he previously maintained the New York Cardwell office prior to its acquisition by BTB, as well as the same location where General Battery and Ceramics Corporation had maintained an *1273 office when he was its Chairman of the Board and Chief Executive.

HISTORY OF ALL EMPLOYEES BENEFIT FUND AND NATIONAL GROUP INDUSTRIAL PENSION PLAN
15. Effective April 26, 1965, Cardwell created an "All Employees Benefit fund" (hereinafter referred to as "Benefit Fund"). With respect to the Benefit Fund Cardwell agreed as follows:
A. To make an allocation for and accumulate funds in the Benefit Fund on the basis of five cents for each regular hour every Cardwell employee worked up to a maximum of forty hours per week for each Cardwell employee. This allocation and accumulation was to be for all employees of Cardwell regardless of whether they were bargaining unit employees, office employees, members of management, or otherwise. Under the agreement no contributions were to be made to the Benefit Fund by the Cardwell employees.
B. The Benefit Fund was created by Cardwell with the specific intent that at some future date it would be converted into one or more pension or retirement plans which together would provide benefits to, and cover all Cardwell employees.
16. Although the Benefit Fund covered and was applicable to all Cardwell employees, the creation thereof was precipitated by negotiations between Cardwell and the Union in April and May of 1965. As a result of these negotiations Cardwell and the Union entered into a contract on May 11, 1965, whereunder the Union expressly consented to Cardwell accumulating and allocating monies for the Benefit Fund as above described, and Cardwell promised that if no agreement could be reached concerning the disposition of that share of the Benefit Fund applicable to bargaining unit employees within a fifty-two week period, then in such event, said share of the total Benefit Fund would be directly distributed to bargaining unit employees eligible therefor.
17. The contract of May 11, 1965, between the Union and Cardwell was extended on April 22, 1966, for an additional period of fifty-two weeks, and again on April 24, 1967, for an additional period of thirty-six weeks. These extensions were by written agreement and on December 8, 1967, which was prior to the expiration of the second extension, Cardwell and the Union entered into a contract whereunder Cardwell agreed to convert that share of the Benefit Fund applicable to bargaining unit employees to a pension or retirement plan for said employees. This contract was reaffirmed in a working agreement entered into by Cardwell and the Union on April 15, 1968.
18. Under the above described extension agreements and the agreements of December 8, 1967, and April 15, 1968, the original obligation of Cardwell with respect to the Benefit Fund and the pension or retirement plan for the bargaining unit employees was modified as follows:
A. Effective April 24, 1967, Cardwell agreed and became obligated to increase its allocation to the Benefit Fund from five cents to ten cents for each regular hour of work performed by every Cardwell employee up to a maximum of forty hours per week for each employee and, further, said allocation of ten cents was increased to fifteen cents effective June 30, 1968.
B. Effective April 25, 1966, Cardwell agreed to pay monthly interest on the accumulated balance of the Benefit Fund at the rate of five per cent per annum.
C. Cardwell agreed to convert that share of the Benefit Fund applicable to bargaining unit employees to a formal pension or retirement plan as of July 1, 1968.
The above described agreements also contemplated that the remaining balance of the Benefit Fund would be converted to one or more other pension or retirement plans which would cover, and be applicable to, the non-bargaining unit employees of Cardwell.
19. The original Benefit Fund agreement of May 11, 1965, and the extensions thereof, as well as the agreements of December 8, 1967, and April 15, 1968, were primarily negotiated on behalf of Cardwell *1274 by its Personnel Manager, G. E. Hutton. Hutton had been employed by Cardwell since 1942 and during most of his employment, and at all times material hereto, he was Cardwell's personnel manager.
The Union and the members of the Local considered the Benefit Fund, as well as the conversion thereof to pension or retirement plan, to be an economic benefit and agreed to the same in lieu of negotiating for wages higher than otherwise agreed upon.
20. Prior to the time that Weitzen and Mrs. Model acquired Cardwell on July 28, 1967, Weitzen was made aware of Cardwell's Benefit Fund liability. After the acquisition Weitzen stated he was in agreement with the Benefit Fund and the plan to convert it to pension or retirement plan for bargaining unit employees as well as the plan to do the same for all other Cardwell employees. On behalf of Cardwell, Weitzen was also one of the signators to the agreement of December 8, 1967, whereunder Cardwell agreed to convert that share of the Benefit Fund applicable to bargaining unit employees to a pension or retirement plan for said employees; and he likewise signed the working agreement of April 15, 1968, which reaffirmed the agreement of December 8, 1967, and increased Cardwell's contribution to fifteen cents. This agreement was signed by Weitzen after he negotiated the sale of Cardwell to BTB and eight days prior to the time the acquisition was formally approved by the BTB Board of Directors. Thus, Weitzen had knowledge of Cardwell's pension plan obligations for both bargaining unit and non-bargaining unit employees at the time he negotiated the sale of Cardwell to BTB and when he knew he would become BTB's Chief Executive Officer as well as at all times subsequent thereto. Following BTB's acquisition of Cardwell, other BTB officers and/or employees, including Jonas, also had knowledge of Cardwell's pension plan obligations.
21. After certain agreements were executed on August 1, and October 9, 1968, which clarified and/or modified the earlier agreements, Cardwell and the Union entered into a contract on October 16, 1968, whereunder a formal pension plan known as The National Industrial Group Pension Plan (hereinafter referred to as "NIGPP") was created for the bargaining unit employees. The contract of October 16, 1968, incorporated the original Benefit Fund agreement of May 11, 1965, and the extensions thereof, as well as the contracts of December 8, 1967, April 15, 1968, and the clarifying and modifying agreements referred to above. Although the conversion to the NIGPP did not occur until some months after July 30, 1968, the date originally agreed upon, such delay was not the fault of either Cardwell or the Union. Under the NIGPP contract it was agreed that:
A. Cardwell would pay the prior accumulated share of the Benefit Fund attributable to bargaining unit employees as of June 30, 1968, into the NIGPP on a monthly basis pursuant to a formula set forth in the conversion agreement of December 8, 1967, as well as the later clarifying agreements of August 1 and October 9, 1968.
B. Concurrent with the payment of past accumulations, as aforesaid, and as of July 1, 1968, Cardwell was to also pay to the NIGPP regular monthly contributions of fifteen cents per hour for each hour of work by each bargaining unit employee up to a maximum of forty hours per week for each employee.
C. The NIGPP trustees would thereafter pay benefits from the funds contributed by Cardwell to Cardwell bargaining unit employees or their beneficiaries as they became eligible for the same and the eligibility requirements for NIGPP benefits were set forth in a booklet which was distributed to Cardwell bargaining unit employees.
22. Although Cardwell was required to make regular monthly payments to the NIGPP, the only payment made by Cardwell was in the amount of $8,214.00, pursuant to a request for check dated September 3, 1969. This payment represented the regular monthly installments owing the NIGPP for July and August, 1969.
23. In late 1969 or early 1970, the Union first became aware that Cardwell was not making the required payments to the *1275 NIGPP when retired bargaining unit employees who were supposed to be receiving pension plan payments from the NIGPP complained to the Union that they were not receiving such benefits. Thereafter, Robert Kirby, a representative of the International, and James Youngdahl, attorney for the Union, made various demands that action be taken with respect to funding the NIGPP; and further, various officers and members of the Local made similar demands upon Bockenheuser, and others who were members of Cardwell's local management.
24. On November 24, 1970, a meeting was held for the primary purpose of negotiating a settlement of the Union's demands upon Cardwell to pay all back amounts owing the NIGPP and to commence making the required regular monthly payments thereto. The Union was represented at the meeting by James Youngdahl, Robert Kirby and members of the bargaining committee for the Local and among those present representing Cardwell were Bockenheuser and Hutton. As a result of negotiations during the meeting, which were in effect between the Union and BTB, a letter of agreement of the same date was prepared setting forth, among other things, the following agreement:
A. That no later than December 15, 1970, direct payments would be made to retired bargaining unit employees who were supposed to be receiving pension plan payments from the NIGPP and such direct payments would be in the same amount as the retired employees would have otherwise received from the NIGPP. It was also agreed that such direct payments would continue until the NIGPP was fully funded.
B. Cardwell also represented that it had a pending government contract claim and it was Cardwell's best "knowledge and belief" that the settlement of the claim would produce funds sufficient to pay all past indebtedness owing the NIGPP and when such settlement funds were received Cardwell would use its best efforts to pay all indebtedness owing the NIGPP. However, the NIGPP or the pension plan obligation was to be fully funded in any event and regardless of the amount of the settlement, if any, of the government contract claim (hereinafter referred to as the "minesweeper claim").
C. In addition, Cardwell agreed to submit written reports to the Union concerning direct payments made to retired bargaining unit employees and to further regularly report on the progress of the settlement of the minesweeper claim and the funds received by reason thereof. Such reports were to be submitted on December 15, 1970, January 15, 1971, and thereafter, at sixty-day intervals until such time as all obligations owing the NIGPP were current.
25. By letters dated December 23, 1970, directed to Cardwell and retired bargaining unit employees, the trustees of the NIGPP terminated the pension plan because of the failure of Cardwell to make the required payments to it.
26. After November 24, 1970, Cardwell made direct payments for a period of time to retired bargaining unit employees in the amount that said employees would have otherwise received as pension payments from the NIGPP and some of the funds for these direct payments were provided by BTB. All such direct payments have since been terminated even though no action has ever been taken to fund the balance of Cardwell's pension plan obligation and liability as agreed (hereinafter the phrase "Cardwell's pension plan obligation," or some phrase similar thereto, shall exclude such direct payments to retirees). In addition, Cardwell did not, at any time, report to the Union on the progress of the settlement of the minesweeper claim as agreed in the letter agreement of November 24, 1970, although interim settlement payments thereon in the amount of $861,000.00 were received within a year following that agreement. Likewise, Cardwell did not, at any time, make a payment on its pension plan obligation even though Cardwell received interim settlement payments on the minesweeper claim and even though that claim was finally settled at a later time. The fact that said interim settlement payments had *1276 been received was unknown to the Union and members of the bargaining unit because of Cardwell's failure to report on the progress of the settlement as agreed.
At the time of the negotiations and execution of the letter agreement of November 24, Cardwell and BTB did not have a reasonable basis to believe, expect and/or make the representation to the Union that Cardwell's pension plan liability would probably be funded by settlement of the minesweeper claim; and thereafter, Cardwell did not exercise a good faith effort to fund the pension plan obligation at the time the interim settlement payments on the minesweeper claim were received or at any other time.
27. On July 1, 1970, and again on January 4, 1971, Cardwell and the Union entered into separate agreements which provided that all agreements and supplements thereto between the Union and Cardwell would continue on a day-to-day basis until such time as the Union gave Cardwell notice to the contrary.
28. After the NIGPP contract was executed Cardwell continued to maintain records allocating funds to the Benefit Fund for non-bargaining unit employees until June of 1971. Weitzen and other officers of BTB were aware that the remaining allocated balance in the Benefit Fund was for Cardwell non-bargaining unit employees and that it was to be converted to a pension or retirement plan or plans for said employees. However, the Benefit Fund, and allocations therein for non-bargaining unit employees, was terminated retroactively in June of 1971, upon the decision of Jonas and/or others in the BTB New York office, which was made known on an occasion when Jonas was at the Cardwell plant.
29. That share of the Benefit Fund attributable to bargaining unit employees which had accumulated prior to the NIGPP agreement of October 16, 1968, and which Cardwell was required to pay to the NIGPP, is in the amount of $62,683.38. The total pension plan and benefit obligation owing for bargaining unit employees is the amount of $254,098.93. Said total amount includes interest, but excludes those direct payments made to bargaining unit retirees as well as the payment made by Cardwell pursuant to the request for check dated September 3, 1969.
30. At the time of trial, Cardwell was still wholly owned by BTB, and was doing business on a limited basis. However, Cardwell is unable to pay its accrued and outstanding pension plan obligation and cannot pay or satisfy a judgment entered therefor.

RELATIONSHIP BETWEEN BTB AND CARDWELL
31. At all times material after BTB acquired Cardwell, BTB's principal place of business was located in a suite of offices located at 230 Park Avenue in New York City, and since the acquisition, BTB maintained a staff which has varied between ten and eighteen people, including secretaries. Although BTB acquired or owned numerous subsidiaries, all but Cardwell and the International Banknote Company, Inc. were sold in 1970 and 1971.
32. In a BTB prospectus filed with the Securities and Exchange Commission with respect to a stock exchange whereby BTB offered shares of its common stock for stock of American Banknote Company, Inc., dated December 22, 1969, and signed by Weitzen and Jonas, the following is stated:
"Through an executive staff of approximately 10 persons, the Company supplies managerial, operational, accounting, financial, legal and other services to its subsidiaries and generally supervises their operations. In addition to general consultation, the Company advises its subsidiaries in connection with specific problems and business areas such as production, engineering, marketing, inventory control, taxes, and banking."
Again in the same prospectus, BTB stated:
"The Company allocated its corporate costs and expenses among its wholly-owned subsidiaries by a charge to such subsidiaries of a percentage of the total assets of each such subsidiary. In management's opinion, these charges approximate *1277 the value of the services rendered to such subsidiaries. . . ."
33. Although such people as Bockenheuser, Harry Langner, Hutton and others constituted Cardwell's local or Wichita management, Weitzen, Mrs. Model and Jonas, controlled and dominated Cardwell and in connection therewith determined, controlled or dominated Cardwell's policy, operational and managerial decisions. Such control and domination was exercised by Weitzen, Mrs. Model and Jonas as officers of BTB and they were considered Cardwell's top management by local Cardwell employees and management who also considered the term New York or New York office to be synonymous with said BTB officers, especially Jonas.
34. In late 1968, Weitzen, acting in his capacity of BTB President, sent Rolland O. Baum, a BTB employee, to the Cardwell plant in Wichita for a period of nine months to a year. Weitzen made the decision to send Baum to Cardwell without prior communication with, or knowledge of, Cardwell's local management. While at Cardwell, Baum's title was "Assistant to the President-Operations," meaning Assistant to Weitzen in Weitzen's capacity as President of BTB, and during that time he was paid an annual salary in the range of $25,000.00 to $30,000.00 by BTB. In addition, Baum represented to others that he was a BTB employee rather than a Cardwell employee or officer.
While Baum was at Cardwell he occupied the President's office formerly used by Weitzen and he was the highest ranking member of Cardwell's local management even though he was a BTB employee. Members of the local Cardwell management reported to, and took orders from, Baum, while Baum reported only to Jonas or others at the BTB New York office.
35. Before Baum was sent to Cardwell and after he left, Bockenheuser was the highest member of Cardwell's local management and during those times there was constant telephone contact between Bockenheuser and the New York BTB office. Most such telephone conversations were with Jonas and during these calls Bockenheuser reported on the various phases of Cardwell's business, operations and affairs and received orders concerning the same which were thereafter implemented or carried out by Cardwell's local management and on some occasions Cardwell's local management was not even aware such decisions had been made.
36. Important areas of Cardwell's operations, business or affairs which were managed, dominated or controlled by BTB included, but were not limited to, the following:
A. BTB controlled or dominated Cardwell finances from the time that Cardwell was acquired by BTB to the end of 1970, BTB advanced Cardwell, exclusive of interest and intercompany corporate charges, the sum of $4,071,526.21 for operating capital. Since the end of 1970 BTB has advanced additional operating capital to Cardwell in the amount of $1,265,463.53. BTB also obtained two additional Heller loans for Cardwell and approved significant communications from Bockenheuser to Heller.
B. In connection with the above described advancements, BTB, primarily through Jonas, controlled and dominated the debt management of Cardwell. In other words, BTB controlled the decision as to when an important Cardwell creditor should be paid and the decision as to the amount of payment that would be made. On some occasions Cardwell's local management was not advised to whom such payment had been made.
As a part of the above described debt management BTB directly paid numerous Cardwell creditors and such direct payments were then charged back to Cardwell by BTB. During a period commencing no later than May, 1969, and ending no earlier than February, 1972, the direct payments made by BTB totaled at least $944,679.35. On thirty-five or more occasions during the same period, BTB also directly wired funds to Cardwell and these wire transfers totaled at least $860,500.00. In 1971 and 1972, some of these wire transfers were made so that Cardwell could pay its employees and *1278 on some occasions the payment of wages to Cardwell employees was delayed beyond the regular payday.
BTB, acting primarily through Jonas, also directly intervened and settled certain claims made against Cardwell by creditors or others and, thereafter, directly paid the creditors pursuant to the settlement agreements so negotiated. Such settlements, on occasion, included the payment of attorneys' fees incurred by the creditors in making their claims against Cardwell. Although the claims directly settled by BTB were substantial, they were not, at the time, as large as the pension plan liability owed the bargaining unit employees. In addition, BTB guaranteed payment to certain Cardwell material vendors or suppliers and also guaranteed performance on some of Cardwell's contracts.
BTB's control over, and determination of, Cardwell's business and debt management constituted an assumption of control by BTB over an area of Cardwell's affairs that was of primary importance.
C. BTB, through Jonas, Weitzen and consultants retained by Weitzen and/or Model, controlled and directed important decisions and disputes relating to Cardwell's government contracts, including the settlement of the minesweeper contract referred to in the letter agreement of November 24, 1970.
Weitzen retained Remarc Associates, Inc. to furnish Cardwell with "contract administration and negotiation services" in connection with Cardwell's government contracts for a basic fee of $1,000.00 per month. The engagement of Remarc was negotiated by Weitzen without consultation with, or notice to, Cardwell's local management, and the agreement between Weitzen and Remarc was set forth in two letters to Weitzen, both dated February 19, 1970, from Hugh Cramer, Remarc's President. Among other things, these letters expressly provide that Remarc would be reimbursed for expenses it incurred as a result of directions from Weitzen and/or Mrs. Model. In addition, one of the letters provided that Remarc statements for fees would "be submitted by Remarc . . . to the BTB Corporation, Attention Mrs. Annabelle Model." After the firm was retained, BTB directly paid Remarc for fees and expenses pursuant to statements which Remarc submitted to BTB.
Some time in 1968, Weitzen and/or Mrs. Model retained R. M. Adams & Associates, a Washington, D.C. consulting firm, for the purpose of securing or assisting in securing government contracts. Weitzen and Mrs. Model were personal friends of R. M. Adams and this friendship was the reason R. M. Adams & Associates was retained. (R. M. Adams & Associates will hereinafter be referred to as "Adams & Associates," and R. M. Adams, the individual, will be referred to as "Adams.") Although Adams & Associates may have rendered some services prior to the formal consummation of BTB's acquisition of Cardwell in May of 1968, Weitzen and Adams did not agree upon the terms of the engagement of that firm until after the acquisition had been approved by the BTB Board of Directors. This agreement was also reached at least two months after Weitzen negotiated the sale of Cardwell to BTB which included Weitzen being made BTB's Chief Executive Officer. In addition, BTB continued to retain Adams & Associates during all subsequent years material hereto and the original arrangement between that firm and BTB was later renegotiated by Weitzen. Thus, Adams & Associates performed most or substantially all of its services for Cardwell after Cardwell had been acquired by BTB.
As was the case with Remarc, Cardwell's local management was not consulted by Weitzen concerning the engagement of R. M. Adams & Associates, or the subsequent renegotiation of the arrangement with that firm. The only knowledge Cardwell's local management had was that Weitzen, Mrs. Model and Adams were personal friends and that such matters were handled by them and/or others in the New York office.
Remarc and Adams & Associates had the responsibility for negotiating the settlement of Cardwell's minesweeper claim. In this connection, Adams reported on the *1279 progress of the settlement and these reports were made directly to Weitzen, Model or Jonas. Such reports were not made to Cardwell's local management.
In addition to the above, Cardwell's local management, including Bockenheuser, were not consulted or advised of other certain important action taken by Weitzen with respect to Cardwell's government contracts or the possibility of obtaining additional contracts.
D. As Cardwell did not have the engineering staff or capacity for its marine handling equipment and the government contracts, outside engineering consulting firms had to be retained to perform the necessary engineering services for these contracts. One such firm that performed substantial services was Pine Tree Engineering, which was located in Portland, Maine. The President of Pine Tree Engineering was Roger Luke, and it was the understanding of some members of Cardwell's local management that Pine Tree had been retained because Luke was a friend of Weitzen and/or Model. Luke sent Pine Tree statements for services and expenses directly to Weitzen and these were usually paid upon Weitzen's specific direction or approval. Either after BTB formally consummated the acquisition of Cardwell in May of 1968, or after the acquisition had been negotiated, Luke also directly participated in the bidding of at least one marine handline equipment contract.
E. After BTB acquired Cardwell, K. L. Bordeau was retained to represent Cardwell with respect to the sale of its products in the middle east. This arrangement was entered into between Bordeau and the BTB New York office and members of Cardwell's local management were advised, and under the impression, that Bordeau was retained because of a friendship with Mrs. Model.
Under the agreement with Bordeau, he was to receive a commission on all sales of Cardwell products in the middle east regardless of whether he was actually responsible for, or consummated any particular sale. Prior to this time, Cardwell had never entered into such an agreement with any of its other foreign sales representatives. Cardwell had established middle east customers and under the agreement Bordeau would receive commissions on all their later purchases, even though he might not have had anything to do with such purchases. Thus, the agreement with Bordeau was an unusual one. Eventually, a dispute arose over commissions owing Bordeau and the matter was handled and settled by BTB.
37. BTB controlled and determined important Cardwell action concerning or involving Cardwell employees, including but not limited to, bargaining unit employees. The Cardwell's work force was increased upon the direct orders of BTB even though Cardwell lacked sufficient materials and work for an increased labor force at the time such orders were given. At a later time Cardwell's work force was also decreased upon direct orders of BTB.
BTB was responsible for changing Cardwell's workman's compensation insurance carrier and coverage and, as a result, there was a period during which local management did not know the identity of the Cardwell workman's compensation carrier even though workman's compensation claims were being made at that time.
BTB also made the decision that there would be no pension or retirement plan or plans for the non-bargaining unit employees of Cardwell, as well as the decision to terminate the Benefit Fund for said employees. As hereinafter described, BTB, through Jonas, was likewise responsible for the November 24, 1970, letter agreement concerning Cardwell's pension plan obligation with the Union for bargaining unit employees; and further, BTB, on some occasions, provided funds for direct payment to Cardwell bargaining unit retirees as set forth in said agreement. During 1971 and 1972, BTB also, on occasion, provided payroll funds to Cardwell.
38. BTB controlled, dominated, determined or intervened in other various Cardwell matters some of which were very important, and others of which were of less significance. These matters included: *1280 Cardwell's accounting practices and procedures and matters of a similar nature; the insurance agency Cardwell used; the determination that all BTB employees were to be carried on, and provided coverage under, Cardwell's life, health and accident insurance policy; the determination that Cardwell would maintain a car in New York City for the use of Weitzen and Model and others at BTB, even though Cardwell was having severe cash problems at the time; the sale of a Cardwell subsidiary; and certain substantial Cardwell legal problems or problems of a similar nature.
39. BTB was at all times fully informed as to Cardwell's business, operations and affairs by reason of the following:
A. Regular telephone reports by Bockenheuser;
B. Direct reports to Weitzen, Mrs. Model and/or Jonas by consultants such as Adams, as well as direct reports or communications between Weitzen, Mrs. Model and/or Jonas and Baum;
C. Monthly financial statements and reporting packages which BTB required from Cardwell;
D. Weekly personnel status reports BTB required from Cardwell which set forth detailed information concerning the Cardwell's work force and, from time to time, other miscellaneous information concerning Cardwell employees was transmitted to BTB;
E. Regular sales status reports;
F. Cash requirement reports;
G. Inventory reports;
H. Detailed reports concerning debts owed by Cardwell;
I. Other additional information of a varied nature was also sent to BTB periodically.
In addition to the above, Jonas visited Cardwell about twice a year and on occasions other BTB employees or consultants retained by BTB, also visited Cardwell.
In connection with Cardwell's government contracts, Weitzen, Mrs. Model and Jonas had access to information that was otherwise unavailable because of security reasons and Jonas was given a security manual which was to only be issued on the basis of a "need to know."
40. The letter agreement of November 24, 1970, referred to in finding of fact 23, was negotiated in the following manner. Youngdahl, the attorney for the Union, would compose a draft of an agreement, or a provision thereof, which would be reviewed by those present at the meeting and, if acceptable to them, Bockenheuser would call Jonas in New York for approval of the same. During the meeting Bockenheuser made two or three such telephone calls and, thereafter, he would advise those at the meeting as to whether New York had approved the proposed agreement or provision, or whether New York required changes or modifications therein. As a result of Bockenheuser's conversations with Jonas it was necessary for Youngdahl to prepare various drafts of the agreement before a final one was agreed upon. Thus, when the agreement of November 24, 1970, was finally approved and agreed upon, it was in effect an agreement negotiated between the Union and Jonas through Bockenheuser.
During this meeting Hutton had a telephone conversation with Jonas during which Jonas advised Hutton, in effect, that Cardwell was not going to have a pension or retirement plan or plans for its non-bargaining unit employees.
41. Cardwell's local management did not have the authority to effectively determine whether the Cardwell pension plan obligation would be either partially or fully funded and such authority rested solely with BTB. The NIGPP contract and the letter agreement of November 24, 1970, were not performed as a result of decisions made by or inaction on the part of BTB. In addition, Bockenheuser and BTB officers mutually understood that the NIGPP contract and said letter agreement would not be performed.
42. On numerous occasions Bockenheuser made comments to other members of Cardwell's local management which reflected *1281 the complete control and domination BTB exercised over Cardwell's affairs, business and operations. Such comments were also made by Bockenheuser to Kirby on occasions when Kirby went to the Cardwell plant in connection with the failure of Cardwell to fund the NIGPP and, additionally, similar statements were made by Bockenheuser to those present at the meeting of November 24, 1970.
43. The above and foregoing Findings of Fact represent the Court's consideration of all the voluminous evidence in the case, his trial notes, the submissions of counsel, both at trial and post-trial, the analysis of both the demeanor and credibility of the witnesses, and logical inferences from all the facts and circumstances in evidence which the Court believes to have been proved by a preponderance of the evidence.

CONCLUSIONS OF LAW

GENERAL CONCLUSIONS
1. The defendant, Cardwell Manufacturing Company, Inc. (hereinafter referred to as "Cardwell"), is a corporation created, existing and doing business in Kansas under the laws of Kansas, and had at all times material hereto a place of business located at Wichita, Sedgwick County, Kansas. Cardwell is, and at all times material hereto was, an employer in industry affecting commerce within the meaning of the Labor Management Relations Act, as amended, 29 U.S.C. §§ 141-187 (hereinafter referred to as the "LMRA").
2. The defendant, International Banknote Company, Inc. (hereinafter referred to as "BTB", its former name), is a corporation created and existing under the laws of New York and has, and at all times material hereto had, a place of business located at New York, New York.
3. The International and Local Unions (hereinafter collectively referred to as the "Union" and separately referred to as the "International" or "Local"), are labor organizations in industry affecting commerce within the meaning of the LMRA and, further, the International and Local at all times material hereto were certified by the National Labor Relations Board as being the sole collective bargaining agency for the Cardwell bargaining unit employees and pursuant to said certification had duly authorized officers and agents engaged in representing or acting for the Cardwell bargaining unit employees in the District of Kansas. Thus, the International and Local are proper parties to maintain the action brought against Cardwell under Section 301 of the LMRA, 29 U.S.C. § 185.
4. With respect to the alternative causes of action based upon the common law theories of Piercing the Corporate Veil, Conspiracy to Breach the below described contracts and/or interference with said contracts, the individual plaintiffs are proper parties to maintain said causes of action against BTB on behalf of and in the name of the Local which is an unincorporated association.
5. BTB, at all times material from and after its acquisition of Cardwell in May of 1968, transacted business within the District of Kansas by and through Cardwell which was controlled and dominated by, and a mere agent, instrumentality and alter ego of, BTB. The causes of action asserted by the International and/or Local arise out of, and are intertwined and connected with, the transactions by which BTB so controlled and dominated Cardwell and, thus, arise out of business transacted by BTB in the State of Kansas through Cardwell, which is and was its mere agent, instrumentality and alter ego.
6. This Court has jurisdiction of the parties and over the subject matter of the action brought by the International and Local against Cardwell under Section 301 and the District of Kansas is the proper venue for such action. (29 U.S.C. § 185(a) and § 185(c).)
7. BTB is a citizen of the State of New York and the Local is an unincorporated association whose members are residents of the State of Kansas. Therefore, a diversity of citizenship exists between the Local and BTB and the amount in controversy in the various common law causes of action brought by the Local against BTB, exclusive of interest and costs, is in excess of *1282 $10,000.00. Thus, this Court has jurisdiction over the subject matter of the common law causes of action brought by the Local against BTB under 28 U.S.C. § 1332; and further, this Court has jurisdiction of and over BTB as BTB was, at all times material hereto, doing business within the District of Kansas within the meaning of K.S.A. 60-308. The District of Kansas is also a proper venue for said cause of action under 28 U.S.C. § 1391.

ACTION OF INTERNATIONAL AND LOCAL BASED UPON VIOLATION OF CONTRACT WITHIN THE MEANING OF SECTION 301
8. The National Industrial Group Pension Plan (NIGPP) contract of October 16, 1968, and the prior "All Employees Benefit Fund" agreements incorporated therein, were entered into by and between the Union and Cardwell and are contracts within the meaning of Section 301. Under these contracts Cardwell was obligated to pay into and fund the NIGPP according to the terms of said contracts.
9. Cardwell failed to pay into and fund the NIGPP and such failure constituted a breach of the NIGPP contract of October 16, 1968, and prior contracts incorporated therein. Such breach was a violation of contract within the meaning of Section 301.
10. When the trustees of the NIGPP terminated said pension plan because of Cardwell's failure to make the required payments thereto, Cardwell's pension plan obligation with respect to the International, Local and its bargaining unit employees was not altered and Cardwell continued to be bound by, and have a pension plan obligation just the same as if the NIGPP and the prior contracts incorporated therein, were in full force and effect.
11. If the NIGPP had not been terminated, Cardwell would owe said pension plan, including interest, the total amount of $254,098.93, by reason of the terms and provisions of the NIGPP contract and prior contracts incorporated therein. Therefore, said $254,098.93 is the amount which Cardwell has failed to pay under its pension plan obligation and such failure was a violation of contract within the meaning of Section 301.
12. The letter agreement of November 24, 1970, between the Union and Cardwell, was a contract within the meaning of Section 301. By the terms of this contract Cardwell was obligated as follows: to directly pay pension benefits to Cardwell retired bargaining unit employees until such time as the accrued amount due and owing under the NIGPP contract or Cardwell's pension plan obligation was paid in full; to regularly report to the Union concerning the progress of the settlement of Cardwell's minesweeper contract claim; and to use its best efforts to pay the accrued amount due and owing under the NIGPP contract or Cardwell's pension plan obligation when settlement payment sufficient to pay said accrued and owing amount were received on the minesweeper contract claim.
13. Cardwell breached the letter contract of November 24, 1970, in the following manner: by terminating direct payments to its retired bargaining unit employees without paying in full the accrued amount due and owing under the NIGPP or Cardwell's pension plan obligation; by failing to report to the Union on the progress of the Cardwell minesweeper contract claim; and by failing to use its best efforts to fully pay the accrued amount due and owing under the NIGPP contract or Cardwell's pension plan obligation when settlement payments sufficient to pay said accrued and owing amount were received on the Cardwell minesweeper contract claim. Each breach above described constituted a violation of contract within the meaning of Section 301.
14. By reason of Cardwell's breach of the above described contracts, all of which constituted violations of contract within the meaning of Section 301, the International and Local are entitled to recover a joint judgment from Cardwell for the benefit of the Cardwell bargaining unit employees in the sum of $254,098.93.
15. Cardwell failed to exercise good faith efforts to pay the accrued amount *1283 owing the NIGPP prior to the termination thereof. In addition, Cardwell failed to act in good faith when the letter contract of November 24, 1970, was negotiated and executed as well as when said letter contract was subsequently breached and violated. By reason thereof, and as an aid to the enforcement of the National Labor Relations Policy, judgment should be entered against Cardwell for reasonable attorneys' fees and expenses incurred by the Union in the prosecution of this action.
16. By reason of the foregoing, a joint judgment should be entered in favor of the International and the Local and against Cardwell for violation of contract within the meaning of Section 301 in the amount of $254,098.93, and for the costs of this action. In addition, judgment should be entered in favor of the Union and against Cardwell for reasonable attorneys' fees and expenses incurred in the prosecution of this action, and the amount thereof should be determined upon hearing.

ACTION OF THE LOCAL AGAINST BTB BASED UPON THEORY OF PIERCING THE CORPORATE VEIL OR ALTER EGO
17. From and after May, 1968, Cardwell was dominated and controlled by BTB and became a mere agent, instrumentality and alter ego of BTB.
18. If BTB is not held liable in this action there will be a resulting injustice and inequity suffered by the Local and Cardwell's bargaining unit employees. Under the circumstances, and because Cardwell was a mere agent, instrumentality and alter ego of BTB, the separate corporate existence of Cardwell and BTB should be disregarded. Therefore, BTB should be held liable for Cardwell's pension plan obligation, and the judgment entered therefor, in order to prevent an injustice or inequity that would otherwise result to the Local and Cardwell bargaining unit employees.
19. The actions of BTB Corporation, through its officers, directors, agents and employees, in concert with the actions of Cardwell's officers, directors, agents and employees, show and constitute such control over the actions of Cardwell, most especially in relation to the conception of the November 24, 1970 agreement and subsequent disregard thereof, as to amount of misrepresentation and fraud upon the plaintiffs. Such concerted conduct was taken in bad faith, and was vexatious, wanton and oppressive in character.
20. By reason of the foregoing, judgment should be entered in favor of the Local and against BTB in the amount of $254,098.93, and for the costs of this action, and the same should be a joint judgment along with the judgment entered in favor of the International and Local against Cardwell. In addition, such joint judgment should also be entered against BTB for attorneys' fees and costs incurred in the prosecution of this action in the same amount as the judgment entered therefor against Cardwell.

ACTION OF THE LOCAL AGAINST BTB BASED UPON INTERFERENCE WITH CONTRACT
21. From and after the time BTB acquired Cardwell, the existence of the NIGPP contract, and Cardwell's pension plan obligation, was known to BTB. In addition, and at all times material, BTB had knowledge of the letter contract of November 24, 1970, and the terms and conditions thereof. Such knowledge on the part of BTB was acquired by and through its directors, officers and employees acting within the scope of their employment and offices.
22. Cardwell was prevented from paying, and did not pay, the accrued amount owing the NIGPP or under its pension plan obligation, as heretofore described, by reason of intentional interference on the part of directors, officers and employees of BTB acting within the scope of their employment and authority. In addition, Cardwell was prevented from performing, and did not perform its obligations under the letter contract of November 24, 1970, as heretofore described, by reason of intentional interference on the part of directors, *1284 officers and employees of BTB acting within the scope of their employment and authority. Such interference preventing Cardwell's performance under said contracts constituted interference with known contractual rights of the Union and directly caused the violation of contracts within the meaning of Section 301. Said interference on the part of BTB was without justification.
23. By reason of the foregoing, a judgment should be entered in favor of the Local and against BTB in the amount of $254,098.93, and for the costs of this action. In addition, and as said interference by BTB directly caused violation of contract within the meaning of Section 301, judgment should be entered against BTB for reasonable attorneys' fees and expenses incurred in the prosecution of this action as an aid in the enforcement of the National Labor Relations Policy, and because its conduct was in bad faith, vexatious, wanton and oppressive in character. Said judgment should be a joint judgment along with the judgment entered in favor of the International and Local against Cardwell.

ACTION OF LOCAL AGAINST BTB BASED UPON VIOLATION OF CONTRACT PURSUANT TO CIVIL CONSPIRACY
24. Subsequent to the execution of the NIGPP contract there was a mutual understanding between officers and employees of BTB and Cardwell that Cardwell would not regularly pay the NIGPP or its pension plan obligation.
25. Subsequent to the execution of the letter contract of November 24, 1970, there was a mutual understanding between officers and employees of BTB and Cardwell that the Union would not be given reports concerning the progress of the settlement of the Cardwell minesweeper contract claim as therein agreed, and that Cardwell would not pay the accrued amount owing the NIGPP, or under Cardwell's pension plan obligation, when settlement payment sufficient to pay said accrued amount owing was received on the minesweeper contract claim. In addition, and also subsequent to the execution of said letter agreement, there was a mutual understanding between officers and employees of BTB and Cardwell that direct payments to Cardwell bargaining unit employees would be terminated even though the amount accrued and owing under the NIGPP or Cardwell's pension plan obligation had not been paid in full.
26. The above described mutual understandings between officers and employees of BTB and Cardwell occurred while they were acting within the scope of their respective employment and authority and constituted civil conspiracy or conspiracies to violate and breach the NIGPP contract or Cardwell's pension plan obligation as well as the letter contract of November 24, 1970. Because of BTB's control and domination over Cardwell, as heretofore described, the approval or aid of BTB was essential in order for Cardwell to pay the NIGPP or its pension plan obligation. In addition, BTB was an integral part of the negotiations leading to the execution of the letter contract of November 24, 1970, and Cardwell's performance of its obligations under that contract depended upon the decision of, or action or inaction by BTB. Said facts were known to the officers and employees of BTB at the time of their above described mutual understandings which constituted civil conspiracy or conspiracies.
27. Pursuant to, and in furtherance of, the above described civil conspiracy and conspiracies, Cardwell failed to pay the accrued amount due and owing the NIGPP or under its pension plan obligation, and Cardwell further failed to perform its obligation under the letter contract of November 24, 1970, as heretofore described. The failure to pay the accrued amount owing the NIGPP or under Cardwell's pension plan obligation, as well as the failure to perform obligations under the letter contract of November 24, 1970, constituted violations of contract within the meaning of Section 301 pursuant to a civil conspiracy or conspiracies and, as a result thereof, the Local and Cardwell's bargaining unit employees sustained damage.
*1285 28. The apparent purpose of the conspiracy was the tortious interference with performance of contract and its result was to unjustly enrich Cardwell and/or its parent holding corporation BTB in the amount of the unpaid pension funds obligated under its or their contract, and such purpose was illegal and unjust.
29. BTB, as a co-conspirator, is liable for the damages caused to the Local and Cardwell's bargaining unit employees by the breach and violation of the above described contracts.
30. By reason of the foregoing, judgment should be entered in favor of the Local and against BTB in the amount of $254,098.93, and for the costs of this action. In addition, and as said conspiracy directly caused violation of contract within the meaning of Section 301, judgment should be entered against BTB for reasonable attorneys' fees and expenses incurred in the prosecution of this action as an aid in the enforcement of the National Labor Relations Policy, and because its conduct was in bad faith, vexatious, wanton and oppressive in character.

OPINION OF THE COURT
This case came before the Court as an action by the plaintiffs to recover damages for breach of a pension fund contract between plaintiff unions on behalf of its members as employees and the defendants as employers. It is properly before this Court on several jurisdictional bases, as indicated in the Court's Conclusions of Law, namely under 29 U.S.C. § 185 of the Labor Management Relations Act, and diversity jurisdiction with requisite amount.
Actually, the existence of the pension fund agreement between plaintiffs and defendant Cardwell Manufacturing Company, Inc. (hereinafter referred to as "Cardwell"), its subsequent breach by Cardwell as a contracting party, and the amount of benefits or damages due to plaintiffs as a result of the breach of contract, are not disputed by the parties or their attorneys, but were in fact stipulated.
The real subject of controversy and sine qua non of this law suit is the legal liability of the defendant BTB corporation, now succeeded by International Banknote Company, Inc., as a parent or holding corporation of the Cardwell corporation. Plaintiffs rest their claim of liability of BTB on three legal theories, all of which the Court holds are soundly based as to applicability and sustained by an abundance of substantial and convincing evidence. These theories of liability encompass piercing the corporate veil of the parent corporation on the claim that it and its subsidiary are one and the same actor; that BTB tortiously interfered with and induced breach of the pension fund contract by Cardwell; and civil conspiracy between the two related corporations and their officers and employees to violate and thwart the contract.
As indicated, there was presented a large amount of evidence, both testimonial and documentary, to prove BTB's culpability on all theories.

ON PIERCING THE CORPORATE VEIL
Many axioms of corporate law are hornbook or encyclopedic. A corporation is an artificial being created by law, composed of a number of natural persons united under a common name, organized for definite purposes, and having continuous succession for the prescribed period of its legal existence. Ordinarily, a corporation is treated as a legal entity, separate and distinct in identity from the members who compose it, and perhaps its greatest business advantage is that it shields participant persons from individual liability for acts of the corporate entity performed within the legal scope of its authority. The concept that a corporation is a legal entity or person apart from its members is a mere fiction of the law introduced for convenience in conducting the business in this privileged way. So extensive and intricate has business practice and the law become that one corporation may own or hold another corporation, or many of them, or a partial ownership interest in one or more of them. Here again, ordinarily several corporations retain their distinct identities, notwithstanding *1286 the fact that they have stockholders and officers in common, or that one corporation owns stock in the others, creating subsidiary or affiliated corporations. However, the concept or fiction of oneness will not be recognized where one corporation is so organized and controlled and its business conducted in such a manner as to make it a mere agency, instrumentality, adjunct or alter ego of another corporation. 18 C.J.S. Corporations §§ 1 et seq., pp. 366 ff.
It has been frequently held that the fact that one corporation owns all of the stock of another and thereby selects from its own directors and officers a majority of all the directors of the other, or that a parent finances a subsidiary, is without more, not sufficient to warrant disregarding separate entity and treating them as one. But where from all the facts and circumstances it is apparent that the relationship between the parent and its subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two so mingled, that recognition of distinct entity would result in injustice to third persons, courts will look through the legal fiction of separate entity and treat them as justice requires. See Garden City Co. v. Burden, 186 F.2d 651 (10th Cir. 1971, on Kansas case); Meehan v. Adams Enterprises, Inc., 211 Kan. 353, 507 P.2d 849 (1973); Kilpatrick Bros., Inc. v. Poynter, 205 Kan. 787, 473 P.2d 33 (1970).
The Tenth Circuit laid down some of the criteria for determination in Fish v. East, 114 F.2d 177 (1940), when it said;
". . . The determination as to whether a subsidiary is an instrumentality is primarily a question of fact and degree. The following determinative circumstances are recognized:
`(1) The parent corporation owns all or majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, `the subsidiary' is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.'"
The above case, however, does not stand for the proposition that all or a significant part of these guidelines must be squarely met in order to pierce the corporate veil. Instead, it is clear that the guidelines enumerated merely summarize factors that should be considered in making a determination as to whether corporate entity will be disregarded. Kansas Supreme Court decisions have always been liberal in indicating "a tendency to disregard the theory of a corporation as an entity separate from its corporators where justice between the real parties to the transaction requires it." Coal Co. v. Nicholson, 93 Kan. 638, 653, 145 P. 571; Avery v. Safeway Cab, T. & S. Co., 148 Kan. 321, 326, 80 P.2d 1099 (1938); Cities Service Co. v. Koeneke, 137 Kan. 7, 20 P.2d 460 (1933).
Here, the evidence is overwhelming that Weitzen, the central personality, along with his sister, Mrs. Model, began sole control of the business and affairs of Cardwell on July 27, 1967, when the Layneshore Corporation, which they solely controlled, acquired the principal stock ownership in Cardwell. Less than a year later, in late May, 1968, Weitzen and his sister sold Cardwell to BTB, and as part of the transaction acquired a major interest in BTB, with Weitzen becoming President of BTB, and both he and his sister becoming members of its *1287 Board of Directors. Some time after the events of this suit, Weitzen and his sister immersed the BTB entity in the International Banknote Company, Inc., the present successor to BTB. Weitzen's biographical background discloses a corporate finance genius skilled in the direction of corporations and the shuffling of corporations on the chessboard of high finance. The principal actors and real directors of Cardwell's corporate policy and operation were Baum and Jonas of BTB, and principal lieutenants of Weitzen as head of BTB. Actually, Weitzen and Mrs. Model were the principal officers and directors of both Cardwell and BTB all through the events making the factual basis for this case. The numerous departmental heads of Cardwell at Wichita testified that it was their understanding and experience that BTB personnel ran Cardwell's affairs and made all principal decisions. The notable exception to testimony about BTB's control was from Bockenheuser, Cardwell's chief employee, whose testimony was vague, hesitating, and overall lacking in credibility, as the Court's trial notes reflect.
Suffice it to say that the evidence clearly indicates BTB's knowledge through its officers, directors and employees of the NIGPP and Cardwell's pension plan obligation at all material times after BTB acquired Cardwell. Thus, at all times, BTB was aware that Cardwell's pension plan obligation was a major Cardwell liability. It similarly was aware of Cardwell's labor force as a major asset whose cooperation was a necessity to the financial well-being and continuity of both Cardwell and BTB during the crucial years of 1970 and 1971, when the evidence shows a shortage of operating capital.
The evidence established that the Cardwell obligations BTB wanted paid for one reason or another were paid. On the other hand, it was clearly shown at the trial that Cardwell did not have the discretion or ability to pay large creditors from funds that were available or which it received without the concurrence and approval of BTB. Thus, in effect, BTB controlled which important Cardwell creditors were paid and which such creditors were not paid. This control was exercised through BTB directly paying specified creditors, direct wire transfers of funds to Cardwell, settling claims made against Cardwell by the creditors and by overall direction of Cardwell operations. See Court's Findings of Fact 21 through 41 for specificity.
Cumulative events showing BTB's control and Cardwell's local officials' lack of control of Cardwell's principal corporate affairs is most convincing and overwhelming.
However, the most damning evidence of both control and the malevolent intent of BTB and its officers to thwart the financing of the pension plan obligation was shown in the facts surrounding the negotiating of the letter agreement of November 24, 1970, between the Union and Cardwell, and the subsequent events during which the major financial disbursement to fund the pension plan was averted or subverted. The Court believes a discussion of this evidence and the logical inferences which this Court or any other reasonable fact-finder would arrive at are apparent. This evidence, standing alone, is enough to establish plaintiffs' theories of liability on any and all of its grounds of recovery, but most especially on interference of contract and conspiracy.
In discussing this aspect of the trial evidence, the Court will make specific reference to plaintiffs' evidence which established such a convincing preponderance. Plaintiffs' Exhibit 44, which is the form 10K report filed by BTB with the Securities and Exchange Commission for the year ending December 31, 1970, under Item 1, "Drilling Rigs and Cranes," at page 5, and the following unnumbered page, makes the following points: (a) Claims for costs on the minesweeper contract had been filed and although additional claims would be filed there was no assurance all of such costs would be recovered. (b) That Cardwell's nongovernmental contract with Avondale Shipyards, Inc. would constitute the "major business" of Cardwell until completed in the spring of 1971. (c) BTB intended to sell Cardwell. [In this connection Plaintiffs' *1288 Exhibit 45, Item 1, "Business," page 2, shows that BTB was selling, and did sell, all of its subsidiaries except American Banknote, Inc. and Cardwell during 1970 and 1971 in order to raise working capital and pay indebtedness. The reason Cardwell was not sold was because of its financial difficulties and problems related thereto. See Plaintiffs' Exhibit 38, letter "To Our Shareholders," page 2; Plaintiffs' Exhibit 39, letter "To Our Shareholders," page 3; Plaintiffs' Exhibit 40, Note H to financial statements, page 14; and Plaintiffs' Exhibit 41, Note H to financial statements, pages 14 and 15.]
Bockenheuser and Gray testified that Cardwell's money problems first became very severe in 1969, as verified in the depositions of Weitzen and Jonas, and Bockenheuser further stated no funds were available for the NIGPP when the letter agreement of November 24, 1970 was executed. In 1970 Cardwell also started to cut down on bids for new work, and during the latter part of that year BTB either started, or planned to start, substantially decreasing its advancements to Cardwell.
Thus, at the time the letter agreement of November 24, 1970 was executed, Cardwell had severe money problems and the prospects for reversing the picture were, at the least, very poor, as were the prospects of replacing the Avondale contract which at that time was Cardwell's most important single contract. On the other hand, bargaining unit employees were needed to complete the Avondale contract as well as other Cardwell work or, in other words, the bargaining unit employees were needed if Cardwell was going to be an ongoing business with continuous operations. It also seems apparent that Cardwell had to continue its operations as an ongoing business in order for BTB to have any chance to succeed in its efforts to sell Cardwell.
Therefore, in the final analysis, the bargaining unit employees were vital to BTB as well as to Cardwell. However, in 1970 the bargaining unit employees were angry about Cardwell's failure to fund the NIGPP and the Union was demanding that Cardwell fully pay this pension plan obligation. Continued disregard of these demands would have led to Union action which would have been a serious or possibly fatal blow to the aims and objectives of BTB and Cardwell.
The above discussion describes the situation at the time the letter agreement of November 24, 1970, was negotiated. Basically, the problem facing BTB was that it did not want to spend money for Cardwell unless it was absolutely necessary, while on the other hand, keeping the bargaining unit employees on the job was essential and to do so required funds, or the promise of funds, for Cardwell's NIGPP obligation. In this setting the effect of the letter agreement BTB was able to negotiate should be examined. With respect to BTB and Cardwell, the agreement accomplished the following: (a) The Cardwell bargaining unit employees agreed to stay on the job; (b) the heavy financial burden of immediately paying Cardwell's pension plan obligation in full was postponed upon the agreement to directly pay pension benefits to Cardwell retirees which, from a relative standpoint, involved a very small expenditure. Plaintiffs' Exhibit 1E contains a schedule showing that as of April 1, 1971, the cost of making direct payments to Cardwell retirees was $1,011.75 per month. Another schedule in the same exhibit reflects that by October, 1971, the cost of these direct payments had only increased to $1,074.77 per month. Therefore, at this time the total annual cost of directly paying Cardwell retirees was less than $13,000.00. This amount should be compared to still another schedule in the same exhibit which shows that as of November 14, 1970, Cardwell owed the NIGPP $186,890.58, and that the obligation had increased to $207,471.48 by October, 1971; (c) the Union agreed to temporarily refrain from taking legal action with respect to Cardwell's pension plan obligation; (d) Cardwell continued to operate as an ongoing business.
BTB and Cardwell were able to get the Union to agree to the letter agreement of November 24, 1970, and thus obtain the *1289 favorable results described above by reason of the representation that the settlement of the minesweeper claim would probably provide sufficient funds to fully pay Cardwell's pension plan obligation; and in any event, once the minesweeper claim was settled Cardwell would use its "best efforts" to pay the pension plan obligation in full. Understandably, the Union wanted regular reports concerning the progress of the minesweeper claim. After the letter agreement of November 24, 1970 was executed, the following happened: (a) BTB continued with its efforts to sell Cardwell, but was unsuccessful because of Cardwell's financial difficulties; (b) the Avondale contract was completed; (c) the negotiations for the settlement of the minesweeper claim were conducted and controlled by BTB and consultants it retained; (d) within a year after the letter agreement of November 24, 1970, interim settlement payments on the minesweeper claim in the amount of $861,000.00 had been received from the government, and in March, 1973, Cardwell agreed to settle the claim for a final payment of $200,000.00; (e) the Cardwell bargaining unit employees stayed on the job and never knew that interim settlement payments in an amount more than sufficient to fully pay Cardwell's pension plan obligation had been received on the minesweeper claim because Cardwell never reported to the Union on the progress of the settlement of that claim as agreed in the letter agreement of November 24, 1970; (f) the record is barren of any attempt by Cardwell to use its "best efforts" to even partially fund, much less fully fund, its pension plan obligation at the time the interim settlement payments were received on the minesweeper claim or at any other time.
The above facts and circumstances raise the question of whether BTB and/or Cardwell had reasonable grounds to believe, expect and represent that Cardwell's pension plan obligation would be fully funded when the minesweeper claim was settled, as set forth in the letter agreement of November 24, 1970, or whether there was no basis for that representation other than speculation and it was made for the purpose of stalling the Union so BTB might have an opportunity to accomplish its own objective. Another question that is raised, which is just as important, is whether the failure to report to the Union on the progress of the settlement of the minesweeper claim was merely an oversight or whether it was motivated by the bad faith belief that such reports would bring a demand by the Union to apply the proceeds from the interim settlement payments to the due and owing pension plan obligation at the risk of the Union taking substantial action. Legitimate inferences from this evidence dictate that both of these questions must be resolved against Cardwell and BTB on any innocuous connotations.

CAUSES OF ACTION FOR INTERFERENCE WITH CONTRACT AND CONSPIRACY
A brief discussion of the applicability of plaintiffs' proof toward establishing proof of their two alternative causes of action as to BTB is necessary.
In a cause of action for interference with a contract, Kansas has long recognized that a party to a contract has such a cause of action against a third party who, without privilege to do so, induces or otherwise purposely causes a breach of contract. Probably the best summary of Kansas law is found in the decision in Baruch v. Beech Aircraft Corporation, 175 F.2d 1 (10th Cir. 1949), wherein the Tenth Circuit Court of Appeals stated:
"We need not probe the outer limits of the rule, for controlling Kansas decisions have set the pattern for this case by adopting the Restatement rule giving a right of action against `one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another . .' Restatement of Torts, Sec. 766. See Nulty v. Hart-Bradshaw Lbr. & Grain Co., 116 Kan. 446, 227 P.2d 254; Russell v. Bovard, 153 Kan. 729, 113 P.2d 1064, 1069; Restatement of Agency, Sec. 312; Restatement of Torts, Sec. 876. It is thus plain that Kansas has not embraced mere *1290 negligent acts of invasion as a basis for liability. Intent or purpose is an essential element of the cause of action under Kansas law. Indeed, the appellant agrees that to establish her cause of action, she must show: (1) the existence of the contract between Horton and herself; (2) knowledge of that contract on the part of Beech; (3) an intentional interference with the known contract right without legal justification; and (4) resulting damages to her. . . ."
Plaintiffs' third theory of conspiracy is closely akin to their second theory of defendants' liability for interference with performance of the pension plan contract. Plaintiffs contend that BTB is liable as a co-conspirator for the breach of the pension plan obligations. A conspiracy may exist between two or more individual persons or individual corporations or by a mixture of people and corporations. Essentially, civil conspiracy exists on the actions of people to bring about an illegal result.
A conspiracy in and of itself is not actionable, but Kansas has long recognized there may be recovery against all members of a civil conspiracy by one who has suffered damages as a result of actionable conduct done by one or more of the conspirators pursuant to the conspiracy. Beverly v. McCullick, 211 Kan. 87, 505 P.2d 624 (1973); Vaughan v. Hornaman, 195 Kan. 291, 403 P.2d 948 (1965); Mosley v. Unruh, 150 Kan. 469, 95 P.2d 537 (1939); Stoner v. Wilson, 140 Kan. 383, 36 P.2d 999 (1934); Hutson v. Imperial Royalties Co., 135 Kan. 718, 13 P.2d 298 (1932).
Although there is some authority to the contrary, most jurisdictions recognize that a conspiracy to procure or induce a breach of contract renders all conspirators liable to the party damaged by the breach. See 15A C.J.S. "Conspiracy" Sec. 13. In Beverly v. McCullick, supra, the Kansas Supreme Court made it clear that Kansas follows this general rule. In that case judgment was entered against the defendants for damages resulting from a breach of contract and one of the grounds for the judgment against the defendants was that the terms of the contract in question were violated pursuant to a conspiracy entered into by the defendants. In the Beverly decision, the Court stated:
". . . The nature of proof in a conspiracy action is well stated in Hutson v. Imperial Royalties Co., 135 Kan. 718, 13 P.2d 298:
`The combination or conspiracy may be proved by evincing a concurrent knowledge and approbation in the persons conspiring, of each other's acts; and it is usually done by proof of the separate acts of several persons concentrating in the same purpose or particular object. . . For the purpose of showing such connection, therefore, circumstantial evidence suffices. The plaintiff may either prove the conspiracy which renders the acts of the conspirators admissible in evidence, or he may prove the acts of the different persons, and thus prove the conspiracy. (5 R.C.L. 1103, 1104.)'"
As stated previously, the evidence in this case was amply sufficient and credible both direct and circumstantially to establish BTB's liability on all of the plaintiffs' theories. Cardwell's liability having been initially conceded by defendants doubtlessly on the popular axiom that "one cannot get blood out of a turnip."
One rather recent Tenth Circuit decision is quite similar factually to the situation in this case, and is considered by this Court as authoritative on all of plaintiffs' theories of recovery. That case is Wyoming Construction Co. v. Western Casualty & Surety Co., 275 F.2d 97 (10th Cir. 1960), wherein Western Casualty issued a performance bond for Wyoming Construction with respect to work that Wyoming subcontracted to do on a dam and dike in Wyoming. The dam and dike were to be constructed by S. J. Groves and Sons Company, pursuant to a contract entered into with the United States Bureau of Reclamation. S. J. Groves subcontracted the earth embankment and riprap work on the dam and dike to Forgey Construction Company. In turn, Forgey subcontracted the riprap work to Wyoming and this was the work for which Western issued its performance *1291 bond. All of the contracts required performance by November 29, 1951; however, this time was eventually extended to July 17, 1952.
The riprap work of Wyoming had to follow the embankment placement by Forgey; however, Wyoming initially failed to perform as expected under its contract because it started late and used inadequate equipment. Finally, Wyoming abandoned the contract as hereinafter described. When Forgey and Wyoming first entered into their subcontract, Wyoming was owned by Wheeler and wife and at that time supplied gypsum under contract to Monolith Portland Midwest Company. This contract was both profitable to Wyoming and advantageous to Monolith as it had lost its prior source of gypsum. Nevertheless, in the fall of 1951, Wyoming had financial trouble and applied to Monolith for help. On January 14, 1952, Monolith advanced $25,000.00 to Wyoming, and Wheeler, the President of Wyoming, considered this advance on a $75,000.00 open line of credit. On the same day, Wyoming stock was assigned to Monolith or its nominees with a repurchase option if the indebtedness was repaid. As a part of the same transaction, Wyoming, in effect, completely surrendered the power to conduct its own business without the approval of Monolith. Although Wheeler continued as President of Wyoming until May, 1952, the efforts to complete the Forgey contract were frustrated by Monolith's control. Monolith refused to advance additional funds and Monolith employees eventually shut down the job in mid-June, 1952. On July 14, 1952, and while Wyoming was under the domination and control of Monolith, a meeting attended by all interested parties was held to determine what should be done about the completion of the subcontract. Monolith's employees, who were acting as officers of Wyoming at the time, phoned their Monolith superiors for directions and then stated Wyoming's position was that it would proceed no further on its contract. Thereafter, Western assumed responsibility under its bond for completing the subcontract and subsequently brought an action against Wyoming and Monolith for damages it sustained by reason thereof. Upon trial to a jury a verdict was returned against Wyoming and Monolith and this verdict was sustained on appeal to the Tenth Circuit Court of Appeals. In its opinion the Court stated:
"Monolith emphasizes that there was no evidence of fraud but it is enough if the disregard of the corporate entity is required to prevent injustice. The issue was submitted to the jury under instructions, which, when taken as a whole and considered in their entirety, fairly and adequately set out the controlling principles. There was substantial evidence from which the jury could find that Monolith controlled and dominated Wyoming in the interests of Monolith and with full knowledge of the situation caused Wyoming to default on the Forgey contract with resulting detriment to Western. The verdict of the jury is sustained. It would be inequitable and unjust to permit Monolith to escape the consequences of its conduct."
To paraphrase the last quoted sentence above from Wyoming, it would be inequitable and unjust here in the case at bar to permit BTB, now International Banknote Company, Inc., to escape the consequences of its conduct.

QUESTION OF ALLOWANCE OF ATTORNEYS' FEES TO PLAINTIFFS' COUNSEL
The Court finally will examine the plaintiffs' claim for an allowance of attorneys' fees and expenses against the defendants, particularly BTB. The Court has found this is a labor law case under Section 301 where allowance of attorneys' fees have long been sanctioned under federal law. Furthermore, here we have a classic case of deprival of economic benefits earned by a rather large group of retired or to be retired employees who accepted the promise of pension plan benefits in lieu of salary increases as the evidence shows. Their eventual realization of the full benefits which the Court has found were wrongfully withheld, even intentionally and fraudulently *1292 so, should not be diminished one penny by the necessity of paying attorneys' fees from the fund. Attorneys perform valuable services for both the enhancement of justice and remuneration. The attorneys on both sides have ably represented their clients. The services of plaintiffs' attorneys in this case have been particularly skillful and persuasive in adversary proceedings over a number of years, resulting in the expenditure of considerable professional time in which both an advantageous, if not public service, cause was involved, and an advantageous result was obtained.
It is abundantly apparent to this Court that the defendants' wrongful conduct was responsible for both breach of the pension fund contract and the necessity of suit for recovery by its either adamant or avaricious attitude against settlement.
As previously indicated, the conduct of the defendants was not salutary with reference to their misrepresentation and anticipated unjust enrichment. One form of punitive sanction, aside from favorable equitable considerations due to the class of beneficiaries in receiving a full award of benefits, would be by allowance of attorneys' fees and expenses to the prevailing side.
The legal foundation for the allowance of attorneys' is based on two sound grounds. One of these, as previously stated, is the judicial interpretation of congressional mandate in federal labor law cases. See Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); United Streetworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and Local No. 149 I.U., U.A., A. & A.I.W. v. American Brake Shoe Co., 298 F.2d 212, 216 (4 Cir. 1962).
If it be said that this basis is again a gray area in light of the recent United States Supreme Court opinion in Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), then the second basis for allowance made here is upon the firmest foundation, evidentiary and legally. The Court has found from the evidence that misrepresentation and fraud existed in the concerted conduct of the two kindred corporations toward plaintiffs; and has further found tortious interference with performance of the pension fund contract or contracts by BTB and civil conspiracy to bring about its unlawful breach.
Finally, the Court has concluded as a matter of law from the evidence, that the overall concerted conduct of the defendant corporations was carried on in bad faith and for vexatious, wanton, and oppressive reasons. This traditional exception to the American rule against judicial allowance of attorneys' fees to a prevailing party is solidly reaffirmed in Justice White's recent opinion in Alyeska.

JUDGMENT OF THE COURT
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that a joint judgment be entered in favor of the International and Local against Cardwell in the amount of $254,098.93, and for the costs of this action.
IT IS FURTHER ORDERED that judgment should be entered in favor of the Local and against BTB in the amount of $254,098.93, and for the costs of this action, and that such be a joint judgment along with the above judgment entered in favor of the International and Local against Cardwell.
IT IS FURTHER ORDERED that judgment be entered in favor of the International and Local for reasonable attorneys' fees and expenses incurred in the prosecution of this action, and that such judgment be jointly entered against BTB and Cardwell. The amount of reasonable attorneys' fees and expenses shall be determined upon hearing.
IT IS FURTHER ORDERED that all amounts recovered on the above judgments attributable to Cardwell's pension plan obligation shall be held in trust by the International or Local and distributed to Cardwell bargaining unit employees who are, or who will become eligible for pension plan benefits under the terms and provisions of the NIGPP contract. Insofar as reasonably *1293 possible, such distribution shall be controlled by, and according to, the terms and conditions of the NIGPP contract just the same as if that contract were in full force and effect. In the alternative, the Union may enter into any reasonable formal pension plan, including the NIGPP, which will provide the Cardwell bargaining unit employees with substantially the same benefits as under the NIGPP contract.
The Court will retain jurisdiction of this matter pending final approval by the Court of a sound plan to insure distribution of the fund of this judgment to entitled beneficiaries thereof.